UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

### CASE NO: 25-cv-02259

TELEMINA BARROS-CUADRADO,
and SOCRATES GABRIEL BARROS-FINCE,

       Plaintiffs,

vs.

MANUEL J. RETURETA, individually,
RETURETA & WASSEM, PLLC.,

       Defendants.

_____/

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, TELEMINA BARROS-CUADRADO and SOCRATES GABRIEL BARROS-FINCE ("Plaintiffs") sue the Defendants, MANUEL J. RETURETA and RETURETA & WASSEM, PLLC and allege as follows:

### A.  SUBJECT MATTER JURISDICTION, PERSONAL JURISDICTION AND VENUE

1.  This is an action for damages in excess of $75,000.00 exclusive of costs, interest and attorney's fees and is within the subject matter jurisdiction of this Court.

2.  This Court has subject matter jurisdiction based on diversity of citizenship under Title 28 U.S.C. § 1332.

3.  Plaintiff, TELEMINA BARROS -CUADRADO ("Barros") is a foreign national and is currently residing in Colombia, South America.

4.  Plaintiff, SOCRATES GABRIEL BARROS-FINCE ("Socrates") is a Colombian national and is currently serving a prison sentence in the Federal Bureau of Prisons in Fort Dix, New Jersey.

5.  Defendant MANUEL J. RETURETA ("Mr. Retureta") is a well-known, veteran criminal defense attorney who resides in Washington D.C. Mr. Retureta practices law across the country

and based upon his residency and law office's headquarters, he is thus subject to the personal jurisdiction of this Court. He has handled hundreds of federal criminal cases, many involving drug trafficking, and many of those, involving Colombians extended to the United States, and many of those charged in the Middle District of Florida – Tampa Division ("Tampa USAO").

6.   Defendant RETURETA & WASSEM, PLLC ("R+W"), is a law firm located in Washington D.C. doing business across the country, including Tampa, and is thus also subject to the personal jurisdiction of this Court. At all times materials and relevant, Retureta was working as a partner in that firm, and it is thus vicariously liable for Retureta's conduct. Hereafter, Mr. Retureta and R+W are referred to jointly as "Defendants".

7.   Venue is proper in the Middle District of Florida- Tampa Division- as this is the district where Socrates was indicted and where most of the significant legal representation and fraudulent conduct took place.

## B.  BACKGROUND (RELEVANT TO ALL CLAIMS)

### a. A FEDERAL CRIMINAL DEFENDANT'S OPTIONS UPON ARREST & AFTER INITIAL APPEARANCE

8.    Every federal criminal defendant faces several options in handling his/her criminal proceeding following arrest and initial appearance. One, proceed to trial and take a verdict. This option is unusual as about 9/10 defendants do not go to trial. Two, plead guilty without a plea agreement and "cooperate" with the government; this is highly unusual. Three, plead guilty without a plea agreement and not cooperate; also quite unusual. Four, plead guilty with a plea agreement and cooperate. This is, by far, the most popular option.[1]  Last, extremely rarely does a federal prosecution get dismissed.

### b. FEDERAL (CRIMINAL) SENTENCING AND HOW IT WORKS

---

[1] Some defendants opt to escape or flee but that's not a legal option.

9.      Federal drug sentences have two main components. One is the United States Sentencing Guidelines (U.S.S.G.) which uses a mathematical sentencing (points) formulation. It starts with a base offense level, adjusted by certain "Specific Offense Characteristics" (and other U.S.S.G. permutations) which drive to "guideline point". The final guidelines point cross references to a guidelines range, which appears on a sentencing table which also considers the defendant's criminal history, if any, arriving at a final recommended guidelines range. The U.S.S.G. however, are merely advisory and not mandatory.

10.      Two, federal sentencing also involves penalties that fall under the correlating criminal statute. Each federal crime carries a maximum term of imprisonment which can vary substantially depending on the class of misdemeanor or felony. Some statutes also carry a mandatory minimum term of imprisonment which, usually can only be waived by the government prosecutor.

11.      Though not applicable here, there are several other elements to a federal sentence: fines, supervised release (commonly called probation), a special assessment and other, yet less relevant ones.

12.      A federal drug crime such as the one in Socrates's underlying federal drug case - involving more than five kilos of cocaine- carries a 10-year (statutory) mandatory minimum sentence. This means that if the advisory/final guidelines sentence range is under the 10-year statutory mandatory minimum, the statute trumps the guidelines.

13.      When a mandatory minimum statutory sentence applies to a drug offense, there are only (two) ways from which a defendant can escape its application. One, through a mechanism called the Crime Bill Safety Valve, from which, if the defendant meets its eligibility requirements, the statutory mandatory minimum sentence can be waived and this is true even if the defendant does not "cooperate". Two, regardless of whether the defendant qualifies for Crime Bill Safety Valve relief,

the government can file a motion to waive the mandatory minimum term as another reward for the defendant's cooperation, again, if it rises to the threshold of "substantial assistance." A "leader", "manager" or "organizer" defendant is ineligible for the benefits of the Crime Bill Safety Valve ("SV").

### c. "COOPERATION" IN FEDERAL CRIMINAL CASES AND HOW IT WORKS

14.    The word "cooperation" is used somewhat loosely but is highly technical in its application. It means that a cooperator- defendant must reveal all he/she knows about the charged crime(s), and other crimes, if applicable of which the defendant has some knowledge. It sounds simple enough; but its not.

15.    If the defendant's testimony for grand jury and/or trial is necessary, the cooperator- defendant must testify, and do so truthfully. Likewise, if the production of relevant materials is available to the defendant, he/she must produce them to the government.

16.    Defendants elect to "cooperate" with the government with the obvious hope and expectation of getting some sentencing leniency down the road by virtue of a government-sponsored motion asking the sentencing judge to reduce the defendant's sentence. But it doesn't always go their way, despite their desire and sincere cooperation efforts. Sometimes, they just "come up short", and the government does not file the motion. When that happens, the defendant is "stuck", almost always with a much higher sentence than otherwise.

17.    A defendant cannot file his/her own cooperation-based sentence reduction motion. He/she can file for a variance based on unrewarded cooperation, and it usually carries little weight; and does not waive the statutory mandatory minimum sentence – 10 years of imprisonment unless the defendant qualified for the SV. Clearly, then, the best chance a cooperator defendant has of getting a significant

sentence reduction is when the federal prosecutor files the motion and advocates for the reduction of both the guidelines level and the mandatory minimum sentence that applies.

18.    When a defendant expresses his/her desire to cooperate to the government prosecutor assigned to the case, generally, but not always, that prosecutor requires that the defendant sign a "cooperation plea agreement" and plead guilty. Cooperation clauses place certain obligations on the defendant, but none on the government, except, of course, to listen to what the defendant-cooperator has to say and pursue any realistic leads therefrom.

19.    More specifically, the government is not obligated to make a sentence reduction motion even if the defendant fully cooperates, is 100% honest and complete in the performance of his/her cooperation and is 100% in compliance with the plea agreement/cooperation clause. In other words, there is no automatic "entitlement" for a cooperating defendant to get a sentence reduction even if he/she exhausts their best efforts in the cooperation.

20.    A government-sponsored sentence reduction motion only arrives for a defendant if, under the government's interpretation of the cooperation, rises to the level of "substantial assistance in the investigation and/or prosecution of others" (i.e., an indictment, an arrest, a drug seizure, grand jury and/or trial testimony, etc.). In other blunt words, results count, earnest efforts do not. Needless to say, a federal prosecutor wields significant power and control over a defendant's ultimate sentence.

21.    The decision as to whether a defendant's government prosecutor will ask the defendant's assigned district court judge for sentencing leniency rests exclusively with the government and that decision is unfettered; Put differently, the government prosecutor has the sole, absolute and unliteral decision-making authority over whether or not he/she will file a sentence reduction motion (to benefit the defendant) with the court.

22.     Moreover, even if the government files such a motion, the (sentencing) district court judge can still deny the motion, although that is virtually unheard of, meaning that almost all district court judges defer to and will not question the government's decision and judgement in that regard and almost always will grant the sentence reduction motion.

23.     How much the defendant's sentence is reduced lies within the sound discretion of the sentencing district court judge. Appealing a sentence – with or without a cooperation/substantial assistance reduction - is useless, unless it exceeds the maximum statutory sentence. Federal appellate courts defer heavily to the discretion afforded to district court judges; it's not a "de novo" standard on appeal. In sum, the stakes and tensions for a federal criminal drug trafficking defendant – cooperator – are quite high.

### d.   "POSITIVOS" (OR "SENTENCING CREDITS")

24.     To get the government to file that "magical motion", a cooperator seeks and pursues what are called "sentencing credits" which may - or may not - add up to "substantial assistance" recognition. In the Hispanic world, these sentencing credits are commonly called "positivos."

### e.   FIRST PARTY v. THIRD PARTY COOPERATION

25.     Cooperation can come from the defendant himself, meaning, based upon his/her direct, personal knowledge. This usually comes from debriefing/interviews with the defendant regarding his/her knowledge about all other co-conspirators and their criminal activities. It can also include a cooperator engaging in government directed proactive activities like making consensual recordings, producing evidentiary materials and testifying as needed.

26.     Cooperation can also come (collaterally) from a third party. That can get sticky, however, as it can become an invitation for the positivo to be purchased from a third party, rather than the credit(s) being personally earned.

27.    Across the country, some United States Attorney's Offices ("USAO") allow "conditioned" third-party cooperation; others prohibit it altogether. Regardless, no USAO allows "positivos" to be brought and paid for via or to a third party who then does the cooperation and attempt to have it credited to the defendant.

28.    The USAO which do allow third party corporation, condition it to come from a genuine relationship between the defendant and the third-party cooperator and, most importantly, for no economic benefit to the third-party cooperator, whatsoever. So, if third party cooperation is performed out of true "love and affection" for the defendant, it can be approved. Obviously, it usually comes from a close friend of the defendant and/or from someone within his/her family looking to help the defendant with no lucre.

29.    Third-party cooperation justifiably concerns government prosecutors and agents because of its ever so obvious inherent dangers and potential for corruption and obstruction of justice. It is also an unfair way for a wealthy defendant to game the system and literally buy his/her freedom.

30.    Third-party cooperation, which is bought and paid for, is a fraud in the court and an obstruction of justice. In other words, it is not truly the efforts of the defendant who is cooperating that benefit the government, but rather, it is the defendant's economic ability to buy his/her freedom by paying money to a third party for the valuable benefit(s) or positivo(s).

**f.  THE TAMPA USAO'S POSITION ON THIRD-PARTY COOPERATION**

31.    The Tampa USAO prohibits paid- for third party cooperation, and, for decades, has aggressively prosecuted lawyers, law enforcement agents/officers, investigators and "case runners" (or brokers) who do third-party cooperation charging money to defendants (and/or their families) for buying positivos and presenting it to any USAO as being first party. This is commonly known

amongst the nationwide criminal defense bar, lawyers who handle these types of international drug trafficking cases, especially out of Tampa.

32.    The purchase of positivos via third party cooperation is not new; it has been a cottage industry gaining back several decades which has enriched many "runners", "brokers" private investigators and defense lawyers.

33.    In the early 1990's, prominent Atlanta attorney, Robert Fierer, opened a company called "Rule 35, Inc". and was indicted for using that company to engage in this type of illegal conduct. His case was national news.

34.    Decades ago, a prominent broker/hustler named Baruch Vega was indicted in Mami by the FBI and USAO in Miami, for doing the same. His case particularly received international media attention which ultimately became a significant best-seller book and Netflix type series called "El Cartel de Los Sapos". That translates in English to "The Snitch Cartel".

35.    One popular and exploited "gig" to buy positvos began in the 1990's. It involved the recruiting of mules in Colombia to ingest or carry drugs on board flights from Colombia to the United States, passing through the border inspection and then making a delivery to a designated person. Often, it was all a set up from the get-go and here is how it worked.

36.    Runners in Colombia would find usually young, vulnerable poor people, usually females – many with a child but no support from the father – and offer them $10,000.00 - $20,000.00 to make a "run" from Colombia to the United States, either as a "swallower", or by carrying it in a suitcase within a concealed compartment. Once the now, young smuggler agrees, the runner would buy the lady's plane ticket and give the flight information and her/the passenger's name to the Defendant, who then "pass" the "tip" to the agents who would await her debarkation at the gate and, "voilà." How could a defendant in federal prison come into possession of such information?

37.    This type of buying positivos were parlayed to USAOs as first party cases. Truth be told, agents and federal prosecutors knew it was happening and turned a blind eye because of the significant amount of border seizures that made for impressive statistics. But the Tampa USAO has always been "on the lookout" for these scams and when it happens, they put a quick stop to it by returning indictments against the conspirator.

38.    In 2005, the Tampa USAO indicted prominent Miami criminal defense lawyers, Paul Lazarus – a former federal prosecutor – and attorney Howard Friedin. In that case, two successful DEA informants, a former drug trafficker and a former sheriff's deputy, paid $40,000.00 for a tip on a airline flight passenger (heroin) case and "sold it" to the government to benefit the defendant as a positive pretending that it had come directly from the defendant. Coincidentally, when that happened, those shenanigans (in Tampa – but also in the Miami USAO) came to a screeching halt, at least for a few next several years. Because it was so obvious and easy to detect.

39.    One Miami attorney did not read the memo. In 2019, the Tampa USAO indicted (now former) Miami criminal defense lawyer, Nelson Alfaro, for using third parties to buy positivos for one or more of his clients and trying to report them to the Tampa USAO as having come directly from his client(s). The Tampa USAO caught onto his fraud. He was sentenced to 14 months in prison.

40.    The federal criminal defense bar – especially the narrower universe of lawyers handling drug trafficking cases with extradited defendants (usually from Colombia, Ecuador, the Dominican Republic, Mexico and Honduras) – is actually very small and communicative.  Whenever a criminal defense lawyer who handles these types of cases gets indicted (or comes under a known criminal investigation) the word spreads like wildfire assisted by a strong wind.

41.    The Atlanta and Tampa USAO prosecutions – and others around the country - have rattled the federal criminal defense bar over decades and have become giant neon signs that buying positivos

and pretending them to be based on the cooperator's firsthand knowledge is a crime of fraud and obstruction of justice.

42.    As stated above, most international extradition federal drug cases end up with the defendant pleading guilty and cooperating. Competition in the world of private federal criminal defense lawyers handling these "big federal drug cases" (as said, the ones mainly involving Colombians, Mexicans, Ecuadorians, Hondurans, and Dominicans), is nasty and fierce.

43.    The pressure is very intense because the defense lawyer - like all his competitors/brethren - tell the same to perspective clients and their families. That is, that the defendant's drug crime puts the guidelines at 20-30 years of prison. So, the conversation quickly turns to what, can the defendant get by hiring lawyer A over lawyer B. The mis-range fees in these cases is about $500,000.00 to $750,000.00.

44.    There are two federal criminal defense bars; the honest ones and the dishonest ones who make promises or "strong predictions" of a sentence they know will never happen – all to get the case.

45.    Jorge Luis Hernandez Villazon a/k/a "Boli" is a runner, like Baruch Vega. He is a Colombian national who fled Colombia 20 years ago to become a significant government cooperator. Boli learned very early how to associate with  desperate-to-cooperate drug trafficking suspects/targets federal drug agents and then bridge them with criminal defense lawyers.

46.    Boli is also a licensed paralegal, and while, at times, he has performed legitimate, bona fide paralegal and investigative services for many lawyers.

47.    Unfortunately, Boli has also used his craft, skill and contacts to take money from desperate federal criminal defendants seeking sentencing reductions by buying positivos from third-parties and charging them hefty fees, using lawyers like Nelson Alfaro and Retureta, as part of his fraud scheme and obstruction of justice.

48.    For that conduct, Boli, himself, is now facing an indictment by the USAO in Tampa. Interestingly, Socrates was one of his "victims." But Boli could not have scammed Socrates – and his family – without the knowing participation of Retureta. Boli is currently being detained without bond at the Citrus County Jail. If Boli "flips" against Retureta, Retureta will also likely be indicted.

### g.   SOCRATES'S FEDERAL (CRIMINAL) TAMPA CASE

49.    On January 31, 2019, the Tampa USAO returned an indictment against five (5) defendants, including Socrates, relating to a federal/international drug trafficking conspiracy under Case No. 19-CR-00041-SDM in the U.S. District Court for the Middle District of Florida.

50.    Socrates was detained at the Santa Martha jail in Colombia awaiting extradition proceedings to the United States.

51.    At the Santa Martha jail, Socrates was visited by Federico Alvarez, an investigator who stated he worked for Retureta.

52.    During this meeting, Federico Alvarez offered legal defense services for a total fee of $1 million, covering three defendants in the case: Socrates, Jorge Leonardo Diaz-Ramos (Ramos), and Santander Barros-Puido. Socrates was the lead defendant.

53.    In order to secure the representation of Socrates, Retureta knowingly made numerous false representations of fact to Socrates and, separately, to his family - particularly his sister, Barros. He used his typical sales pitch.

54.    Retureta told Socrates while Socrates was in the Colombian jail, that he would need to plead guilty and cooperate; that he would help him with the purchase of positivos to get him a final sentence of 5-7 years of prison.

55.    Retureta told Socrates that he was "well-connected" with the case prosecutor and agents.[2]

---

[2] While in the United States that might sound and be meaningless, when you tell that to a Colombian drug trafficker, translates into "the fix is in" as that is how it works there. Plain and simple.

56.     Retureta guaranteed the Plaintiffs a good deal and assured them that Socrates would receive a reduced sentence. He further assured a sentence for Socrates between 5 and 7 years, and said that they were already working on the positivos even before Socrates was extradited from Colombia to Tampa.

57.     Plaintiffs bought and paid for four (4) positvos. They had no idea it was a scam. Even if the purchase of the positivos was true, it was still illegal and would never get credited to Socrates's sentence.

58.     Retureta told the Plaintiffs that the four positivos would all be taken into account, but they were not taken into account. Indeed, it now appears there were likely less than 4 positivos.

59.     On April 21, 2022, Socrates and Ramos were transported from their detention facility in Colombia for pretrial detention in a local jail in Tampa.

60.     While housed at the Pinellas County Jail, Socrates received visits from Jorge Hernandez, also known as "Boli," who serves as a paralegal for attorney Manuel Retureta, accompanied by Retureta's investigator, Federico Alvarez.

61.     On or about April 27, 2022, Retureta entered his appearance on behalf of both Socrates and Ramos via pro hac vice motions.

62.     It is extremely rare in a federal criminal drug conspiracy for co-defendants to not have a conflict of interest between them. While by law, the conflict can be waived – such as it was here – it nevertheless presents significant ethical challenge for the lawyer. Stated differently, the waiver does not eliminate the conflict.

63.     Evidence of the severe conflict here is that Socrates received a sentence 3 times the length of Ramos's sentence and both signed plea agreements with cooperation clauses, meaning that each agreed, if necessary, they would testify against the other.

64.    Consequently, Retureta was strongly motivated to get Socrates and Ramos to plead guilty because had either defendant elected to go to trial, he likely would have been disqualified and had to return money to both defendants- and their families.

65.    Also, to advocate for his client Ramos's low-level role in the conspiracy, Retureta had to "point the finger at Socrates" who was the leader. At the same time however, Retureta had an ethical obligation to advocate against the much higher role for his other client – Socrates – by alleging that his role was more akin to Ramos's, than that of a leader.

66.    As said earlier, Socrates was viewed by the government as being a leader, manager, and organizer whereas Ramos had a much lesser working role, such as transporting cocaine and delivering it to launching sites and engaging in communications with some of the co-conspirators. Simply put, this drastic differentiation in the roles of Socrates versus Ramos put Retureta in a position where he could not effectively represent both defendants, despite the conflict waivers. Yet, he took money from the families of both defendants.

67.    The trial for both defendants was set and thereafter moved/continued - by consent - on multiple occasions during 2022 and 2023.

68.    On July 18, 2022, Plaintiff Barros personally met with Retureta in Bogotá at the Marriot El Dorado Hotel in a conference room on the second floor. The meeting was scheduled for 11:00 a.m. but began at 11:30 a.m.

69.     In the meeting, Retureta again made promises to Plaintiff Barros that he had obtained approval of all of the third-party cooperation; that the positivos were going well and that was – in large part – why his fees were so high. He again promised Plaintiff Barros that, based on Socrates's direct cooperation and the positivos, Socrates was very likely looking at 5-7 years of imprisonment.

70.    Plaintiff Barros continuously demanded the fee/ representation contract, but Retureta refused to hand it over.

71.    In one call, Retureta gaslighted Plaintiff Barros when she complained about not having a copy of the fee/ representation contract and told her to stay calm; that he wouldn't give up on the case; and that she appeared more interested in the fee contract than in Socrates's (her brother) freedom – just to shut her up.

72.    On March 1, 2023, Socrates and Ramos signed plea agreements and pled guilty to drug trafficking conspiracy.   The plea agreement – and plea colloquy – required Socrates to agree that he received no sentencing promise from anyone, including Retureta.  However, Retureta told him that signing the plea agreement was a mere formality to get the deal; that it would not apply or it was meaningless because he was getting the government's sentence reduction motion.

73.    The sentencing for both defendants was set and rescheduled - by consent of the parties - during 2023, until they were both sentenced on November 9, 2023.

74.    Socrates received a sentence of 210 months in the Bureau of Prisons; Ramos's term of imprisonment was 87 months.

75.    A simple review of the factual basis of Socrates's and Ramos's plea agreements vividly highlights the conflict of interest that Retureta was operating under, despite the (meaningless) "waivers".

76.    Retureta conspired with Boli and Federico Alvarez to obstruct justice because they knew that buying positivos is illegal, and that's exactly what Boli was prepared to do and ultimately did do, all to enrich themselves. Federico Alvarez is currently in a position to "flip" against Retureta – just like Boli.

77.     Desperate for a sentence reduction, Plaintiffs paid almost a million dollars to Retureta and Boli and Federico Alvarez. They are not sure how that money was split up by and between the two.

78.     Retureta/Boli's combined fee was the equivalent of somewhere between $700,000.00 and $800,000.00 U.S.D. Via Boli and his contacts in Colombia, to include Boli's brother, they received properties (vehicles, houses, and cash) at a pesos-to-dollar exchange rate of $3,600 Colombian pesos per U.S.D.

79.     Retureta met with, approved, sponsored and permitted Boli to take money from Plaintiff Barros to buy positivos for Socrates, some of which, parenthetically, were never even obtained. In other words, it was a total fraud all along by Retureta and Boli.

80.     Cash payments from the sale of properties and other cash were as follows:

- $405,000,000 million pesos in cash delivered in Valledupar
- $95,000,000 million pesos delivered in cash in Colombia
- $500,000,000 million pesos delivered in Vehicles
- $110,000,000 million pesos delivered in Riohacha
- $700,000,000 million pesos delivered in Maicao
- $220,000,000 million house delivered in Riohacha
- $80,000,000 million pesos Toyota brand car
- $580,000,000 million pesos delivered in cash, in Colombia

**Total:** $2,690,000,000 million pesos

81.     Plaintiffs made the payments to Retureta and Boli through third parties Boli designated, by delivering the cash, cars, and properties to Retureta's and Boli's agents in Colombia. All of these payments were made between September 2020 and December 2020.

82.     The property surrendered was converted into Colombian pesos and was paid for in Colombia. How much and in what manner Retureta exactly got paid is currently unknown. But more likely than that, he was not working pro bono. Discovery will reveal answers to those questions.

83.     At one point in time when the fee payments were not coming in with the speed to Retureta's liking (in late 2020), he dispatched Boli and Federico Alvarez to the local Tampa jail to pressure

Socrates to "pay up." In that "legal visit," they told Socrates that if he did not immediately complete the total fee payment, that his family in Colombia would suffer severe consequences.

84.    Retureta then either used the Black-Market Peso Exchange to get paid in the United States, or converted the Colombian pesos to U.S. dollars in Colombia, and transported the cash to the United States, either himself, or via a third-party. Discovery will reveal how much money he received, whether he declared it all as an income, what expenses he had, and how he got that money in (or into) the United States.

85.    The in-kind payments (via property conversions into cash) were coordinated by Boli and Federico Alvarez who were delegated to receive the payments and get Retureta's money to him in the United States. In Colombia, Boli also assigned his own brother, Javier, to actively receive the property/money, but all of this was done under Retureta's directive and/or approval.

86.    When Socrates' sentence of 210 months was handed down, Socrates and Plaintiff Barros confronted Retureta. Retureta said that he had spoken to the prosecutor and that the positivos were being "*left in a bank to be applied when the next sentence hearing occurred for Socrates"* That was a lie. Socrates fired Retureta and hired new criminal defense counsel, George Vila.

87.    Retureta's conduct makes him guilty of fraud in the inducement, concealment fraud, conspiracy, obstruction of justice, professional negligence, and gross negligence.

88. No doubt, Defendants' defense to all claims will be that during the colloquy at the change of plea hearing (under Rule 11 of the Federal Rules of Criminal Procedure) that Socrates was sworn in, and consistent with his signed plea agreement, acknowledged that no promises and been made to him by an person, including the government, the probation office, his counsel or the court. However, Socrates will testify that Defendants told him to expect that and that he had to sign the plea agreement with that language and say what he said during the plea

colloquy in order to get the benefits which were assured; that he was warned by Retureta that if he told the court the truth about the promised sentence and positivos, it would blow up the plea.

89.  Thus, following his lawyer's advice, he signed the plea agreement and answered the judge's questions as required in order to not scuttle the deal.

90.    Much of Retureta's misconduct runs afoul of ethical rules of the bar that regulates his license to practice law in any lawyer's bar, state or federal.

## COUNT I – PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE (as to both Defendants)

Plaintiff adopts, realleges, and incorporates the allegations contained in paragraphs 1 through 90 and further states:

91.    On or about the fall of 2020, the Plaintiffs hired the Defendants to represent Socrates in his federal criminal case in Tampa.  That created a duty to be fair and honest with the Plaintiffs and all other duties that arise under an attorney- client relationship. These are duties of candor, fiduciary, trust, honesty, fairness, competence, zealousness; not to charge an excess fee.

92.    The representation contemplated that Socrates would benefit from a U.S.S.G §5K1.1 motion or a U.S.C. § 3553(e) and/or Rule 35(b) motion with false promises that Socrates would end up with a final sentence of about 5-7 years in prison.

93.    The Defendants charged the Plaintiffs between $700,000.00 and $800,000.00 for the entire representation. Plaintiffs paid the Defendants the fee in full.

94.    Pursuant to the engagement, the Defendants owed the Plaintiffs a duty of reasonable care commensurate with the standard of care in the legal community at the time to Plaintiff Barros and her brother, Socrates.

95.    The Defendants breached the duty by:

- charging Socrates and his sister an excessive fee;
- failing to provide Socrates and his sister with an accounting for fees/costs;
- defrauding Socrates and his sister's lack of candor;
- lying to Socrates and his sister that Socrates could benefit from a positivo; and
- misleading Socrates and his sister into believing that he possessed the ability to improve his sentence.

96.    As a direct, natural, legal and proximate cause and result from this professional negligence, the Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs by and through their undersigned counsel, hereby demand judgment against the Defendants for all damages allowed under Florida law, including without limitation all actual and compensatory damages, costs, interest as applicable, and such other relief to which he may be legally and equitably entitled, or which this Court deems fair and just.

## <u>COUNT II – FRAUD IN THE INDUCEMENT (as to both Defendants)</u>

Plaintiff adopts, realleges, and incorporates the allegations contained in paragraphs 1 through 90 and further state:

97.    In or about the fall of 2020, the Plaintiffs hired the Defendants to represent Socrates in his federal criminal case in Tampa.

98.    The Defendants made certain representations of material fact to the Plaintiffs that were knowingly false when made. Those false statements are those particularly plead in paragraphs 54-58 above.

99.    At the time these representations were made, the Plaintiffs were extremely vulnerable, and the Defendants preyed upon that weakness.

100.    The Defendants made these representations to the Plaintiffs intending that they rely upon it to hire the Defendants.

101.    These representations were material to the Plaintiffs in that they reasonably relied on them formulating their decision to hire the Defendants and, in fact, induced the Plaintiffs to hire the Defendants.

102.    The Defendants charged the Plaintiffs between $700,000.00 to $800,000.00 for the entire representation.

103.    Ultimately, the Defendants were unable to obtain the result he promised for the Plaintiffs, which they falsely represented they could do and therefore they deceived the Plaintiffs.

104.    As a direct, natural, legal and proximate cause and result from this fraud in the inducement, the Plaintiffs have been damaged.

       **WHEREFORE**, Plaintiffs, by and through his undersigned counsel, hereby demand judgment against Defendants for all damages allowed under Florida law, including without limitation all actual and compensatory damages, costs, interest as applicable, and such other relief to which he may be legally and equitably entitled, or which this Court deems fair and just.

## COUNT III – CIVIL CONSPIRACY TO COMMIT FRAUD IN THE INDUCEMENT

       Plaintiff adopts, realleges, and incorporates the allegations contained in paragraphs 1 through 90 and further states:

105.    A conspiracy existed between Defendants, Boli and Federico to defraud Plaintiff Barros and Socrates by charging them $800,000.00 to represent Socrates under false pretenses and promises.

106.    The conspiracy formed had the goal to perform unlawful acts.

107.    Specifically, as explained in the general allegations incorporated herein, the Defendants made certain representations of material fact to the Plaintiffs that were knowingly false when made.

Those false statements are as follows: The representation contemplated that Socrates would benefit from a U.S.S.G §5K1. motion, a Title 18 U.S.C. § 3553(e) and/or Rule 35(b) motion with false promises that Socrates would end up with a final sentence far below what he otherwise was facing (without a "positivo").

108.    Those representations were made intending to induce the Plaintiffs to give the Defendants $800,000.00.

109.    Those representations were material in that they, in fact, induced the Plaintiffs to retain the "Retureta Team" and pay $800,000.00 for nothing but false promises in exchange.

110.    The Plaintiffs reasonably and desperately relied on all of the representations.

111.    Such reliance was detrimental to the Plaintiffs and was the direct, legal and proximate cause of damages to the Plaintiffs.

112.    This scheme was perpetuated in order to secure the payment of $800,000.00 from the Plaintiffs to the Defendants.

113.    This agreement benefited the Defendants.

114.    As a further direct and proximate result of the aforementioned conspiracy, Plaintiffs suffered and continues to suffer severe financial damages.

        **WHEREFORE**, Plaintiffs by and through his undersigned counsel, hereby demand judgment against Defendants for all damages allowed under Florida law, including without limitation all actual and compensatory damages, costs, interest as applicable, and such other relief to which he may be legally and equitably entitled, or which this Court deems fair and just.

### <u>COUNT IV – BREACH OF CONTRACT (as to both Defendants)</u>

        Plaintiff adopts, realleges, and incorporates the allegations contained in paragraphs 1 through 90 and further state:

115.    In or about 2020, Plaintiffs and Defendants entered into a contract whereby Defendants would provide legal services for Plaintiff Socrates in his Tampa criminal case.

116.    Plaintiffs fully performed under the contract and paid the Defendants the legal fees quoted.

117.    Defendants have breached the contract by failing to perform under the contract. Specifically, representation contemplated that Socrates would benefit from a U.S.S.G §5K1. motion, a Title 18 U.S.C. § 3553(e) and/or Rule 35(b) motion with false promises that Socrates would end up with a final sentence far below what he otherwise was facing (without a "positivo").

118.    Defendants breached the contract with Plaintiffs and Plaintiff has been damaged.

119.    Plaintiffs have met all conditions precedent to bringing this claim or they are waived or excused.

WHEREFORE, Plaintiffs seek a judgment against Defendants, for damages and costs, an award of attorneys' fees and costs if allowed by law, and any other relief this Court deems just and proper.

## VII- CLAIM FOR PUNITIVE DAMAGES

Plaintiff adopts, realleges, and incorporates the allegations contained in paragraphs 1 through 90 and further state:

120.    Based upon the foregoing and the September 12, 2025 finding of the Court in the Middle District of Florida in the matter of *United States v. Jorge Luis Hernandez Villazon* (Case No. 25-CR-327-WFJ) that the defendant there, Jorge Hernandez Villazon was engaged in acts that, "*at a minimum, suggest 'rainmaking' and illegal fee splitting with attorneys in a fraudulent manner,*" (See **Exhibit A** attached) - clearly referencing the Defendants herein, Plaintiffs are entitled to punitive damages.

121.    The acts and omissions of the Defendants with respect to the representations they made to the Plaintiffs, were outrageous and/or undertaken with reckless disregard to the rights and interests of the Plaintiffs.

122.    Plaintiffs are entitled to the maximum award of punitive damages allowed by law.

**<u>DEMAND FOR JURY TRIAL</u>**

The Plaintiffs demand trial by jury in this cause.

Dated this 1 day of October, 2025.

**RICHARD J. DIAZ, P.A.**
3127 Ponce de Leon Blvd.
Coral Gables, FL  33134
Telephone: (305) 444-7181
Facsimile: (305) 444-8178
Email: rick@rjdpa.com

s/ *Richard Diaz*
By: _____
Richard J. Diaz, Esq.

22